## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

Marshall County Board of Education and
Wetzel County Board of Education,
Individually and on Behalf of All Others
Similarly Situated,

       Plaintiffs,

v.

Cencora, Inc. f/k/a AmerisourceBergen Drug
Corporation; Cardinal Health, Inc.; and
McKesson Corporation,

       Defendants.

Civil Action No. 5:26-cv-27 Bailey

Jury Trial Demanded

ELECTRONICALLY
FILED
02/03/2026
U.S. DISTRICT COURT
Northern District of WV

## CLASS ACTION COMPLAINT

## Table of Contents

Introduction ........................................................................................................................ 1

    Parties ........................................................................................................................ 3

    Plaintiffs .................................................................................................................... 3

    Defendants ................................................................................................................. 3

Juridiction & Venue ......................................................................................................... 4

Factual Allegations ........................................................................................................... 5

    Defendants participated in the massive oversupply of opioids into West Virginia ...................... 5

    The industry's duties were well known and repeatedly reinforced ................................. 6

    The DEA repeatedly raised the alarm about opioid oversupply ................................... 7

    Defendants consciously disregarded red flags and took affirmatively evasive
    actions to avoid notice .............................................................................................. 8

    The government's investigations obtained admissions from Defendants ...................... 11

    Impacts on public school board in West Virginia ..................................................... 12

Class Allegations ............................................................................................................ 13

Statute of Limitations ..................................................................................................... 14

Causes of Action ............................................................................................................. 15

    Count I: Common Law Public Nuisance ................................................................. 15

    Count II: Common Law Negligence ........................................................................ 17

    Count III: Negligent Violation of Statutory Duties ................................................. 18

Jury Demand ................................................................................................................... 18

Prayer for Relief ............................................................................................................. 19

## Introduction

1.      American public schools perform an indispensable function central to the health of American democracy: they provide a free public education to every student who comes through their doors. Over the last two decades, however, in addition to fulfilling this essential mission, public schools have been forced to absorb substantial and escalating costs arising from one of the most profound and enduring consequences of the worst man-made medical epidemic in modern medical history—the nationwide opioid epidemic. These costs have been imposed on public schools by Defendants' conduct.

2.      As alleged in this Complaint, Defendants ignited and fueled the opioid crisis—including in West Virginia, where they flooded the state with opioid pills in quantities that vastly out-paced any medical need for them: 433 pills for every man, woman, and child in the state. As a result of Defendants' conduct, substantial numbers of pregnant women in West Virginia were exposed to opioids during pregnancy. And because opioids cross the placenta—a fact Defendants knew or should have known—these mothers' infants were exposed to opioids in utero, often with devastating consequences.

3.      Nationwide, infants are now born suffering from Neonatal Opioid Withdrawal Syndrome ("NOWS," also known as Neonatal Abstinence Syndrome or "NAS") approximately every 15 to 25 minutes. In West Virginia, the epicenter of the opioid crisis,[1] the rate has been even higher, reaching 68 per 1,000 births in 2020, roughly four times the national average.[2] Children exposed to opioids prenatally disproportionately developed cognitive and behavioral

---

[1] Rachel Merino, *et al.*, Nat'l Library of Medicine, *The Opioid Epidemic in West Virginia* (Apr./June 2019), *available at* https://pubmed.ncbi.nlm.nih.gov/30920991/.
[2] K.D. West, *et al.*, *Prenatal Substance Exposure and Neonatal Abstinence Syndrome: State Estimates,* Maternal and Child Health Journal (2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10204012/.

conditions that, when they reach school age, require special education services and supports, often beginning in early childhood and continuing through high school.[3] Federal law requires public schools to identify, evaluate, and serve these children. 34 C.F.R. §§ 300.320-300.32m. Providing the required services approximately doubles the cost of educating these students,[4] creating a surging and unavoidable expense that is punching holes in public schools' budgets.

4.      Even if the opioid crisis were to end tomorrow, public schools would continue to incur these extraordinary costs for another dozen or more years—until the cohort of affected children currently in pre-kindergarten or kindergarten completes high school.

5.      Plaintiffs bring this action on behalf of themselves and a statewide class of all independent public school boards in West Virginia. Every member of the proposed class bears substantial and steadily increasing costs associated with providing special education and related services to children exposed to opioids before birth. West Virginia Public School Boards have already incurred—and will continue to incur—hundreds of millions of dollars of expenses to provide legally required services to educate and support these children.

6.      Although significant attention has been paid to the strain the opioid epidemic has placed on public health systems and other governmental services, the distinct, substantial, and long-term costs inflicted on the nation's public schools have gone largely unnoticed—and remain

---

[3] *See* Chasnoff, IJ, Seiger ML (2023), *Prenatal Opioid Exposure and Special Education Needs: A Sibling Study*, Adv Pediatr Res. 10:069; Mary-Margaret A. Fill, *et al.*, *Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome*, 142 Pediatrics e20180562 (2018); Oei JL, Melhuish E, Uebel H, *et al.*, *Neonatal Abstinence Syndrome and High School Performance*, 139 Pediatrics 2 (2017); Sirnes, Eivind, *et al.*, *Brain morphology in school-aged children with prenatal opioid exposure: a structural MRI study*, Early Human Development 106, at 33-39 (2017).

[4] *See* Jay G. Chambers, *et al.*, *Total Expenditures for Students with Disabilities, 1999-2000: Spending Variation by Disability*, Special Education Expenditure Project 4 (June 2003), *available at* https://www.air.org/sites/default/files/SEEP5-Total-Expenditures.pdf.

uncompensated.

## Parties

### *Plaintiffs*

7.      Plaintiff **Marshall County Board of Education** (Marshall County Board), on behalf of Marshall County Schools, is an independent public school district in West Virginia, located at 214 Middle Grave Creek Road, Moundsville, WV 26041.

8.      Plaintiff **Wetzel County Board of Education** (Wetzel County Board), on behalf of Wetzel County Schools, is an independent public school district in West Virginia, located at 300 Foundry Street, New Martinsville, WV 26155.

9.      The Marshall and Wetzel County Boards bring this civil action against Defendants on behalf of themselves and other similarly situated public school boards in West Virginia to recoup money they have spent and will spend because of Defendants' conduct and to abate the effects of the opioid epidemic on public schools caused by Defendants' conduct.

### *Defendants*

10.      Defendant **AmerisourceBergen Drug Corporation** is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. On August 30, 2023, AmerisourceBergen changed its name to Cencora, Inc.—but for purposes of this Complaint will be referred to as AmerisourceBergen. AmerisourceBergen is a federal Drug Enforcement Administration (DEA) registered "distributor" of prescription opioids, with duties to detect, block, and prevent diversion of those drugs. AmerisourceBergen has also operated, at all relevant times, as a wholesale distributor licensed by the West Virginia Board of Pharmacy. Between 2007 and 2012 alone, AmerisourceBergen shipped about 119 million opioids into West Virginia.[5]

---

[5] *Combatting the opioid epidemic: examining concerns about distribution and diversion*:
*Hearing Before the United States House of Representatives Committee on Energy & Commerce,*

By revenue, AmerisourceBergen is currently the seventeenth largest company in the world.[6]

11.    Defendant **Cardinal Health, Inc.** is an Ohio corporation with its principal place of business in Dublin, Ohio. Cardinal Health is a DEA registered "distributor" of prescription opioids, with duties to detect, block, and prevent diversion of those drugs. In addition, AmerisourceBergen has operated, at all relevant times, as a wholesale distributor licensed by the West Virginia Board of Pharmacy. Between 2007 and 2012 alone, Cardinal Health shipped 241 million opioids into West Virginia.[7] By revenue, Cardinal Health is currently the twenty-fifth largest company in the world.[8]

12.    Defendant **McKesson Corporation** is a Delaware corporation with its principal place of business in San Francisco, California. McKesson is a DEA registered "distributor" of prescription opioids, with duties to detect, block, and prevent diversion of those drugs. In addition, McKesson has also operated, at all relevant times, as a wholesale distributor licensed by the West Virginia Board of Pharmacy. Between 2007 and 2012 alone, McKesson shipped more than 150 million opioids into West Virginia.[9] By revenue, McKesson is currently the eleventh largest company in the world.[10]

## Jurisdiction & Venue

13.    This Court has subject matter jurisdiction over this matter under 28 U.S.C.

---

*Subcommittee on Oversight & Investigations* (May 8, 2018), *available at* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/documents/20180508-OI%20Combating%20the%20Opioid%20Epidemic%20Examining%20Concerns%20About%20Distribution%20and%20Diversion.pdf.

[6] Fortune, Fortune Global 500, *available at* https://fortune.com/ranking/global500/.

[7] *Combatting the opioid epidemic, supra, available at* https://www.congress.gov/115/meeting/house/108260/documents/HHRG-115-IF02-Transcript-20180508.pdf.

[8] Fortune, Fortune Global 500, *available at* https://fortune.com/ranking/global500/.

[9] *Combatting the opioid epidemic, supra, available at* https://www.congress.gov/115/meeting/house/108260/documents/HHRG-115-IF02-Transcript-20180508.pdf.

[10] Fortune, Fortune Global 500, *available at* https://fortune.com/ranking/global500/.

§ 1332(a) because Plaintiffs are citizens of the State of West Virginia, Defendants are not citizens of West Virginia, there is therefore complete diversity between the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14.     This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000 exclusive of interest and costs and this is a proposed class action in which at least one member of the class is a citizen of a State different from any defendant.

15.     Venue is proper in this district, and Defendants are subject to personal jurisdiction in this district because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in, were directed to, or emanated from this district and because Defendants have requisite minimum contacts with this district.

### Factual Allegations

***Defendants participated in the massive oversupply of opioids into West Virginia.***

16.     Between 2007 and 2012, approximately 700 million hydrocodone and oxycodone pills—dangerous and highly addictive opioids—were shipped into West Virginia, amounting to 433 pills for every man, woman, and child in the State.[11] Defendants, responsible for the lion's share of these shipments, shipped them with actual knowledge, or at a minimum conscious disregard, that these quantities bore no relationship to any measure of legitimate medical demand in West Virginia and that large quantities were being diverted into illicit channels. Cardinal Health shipped 241 million of these pills. Defendant AmerisourceBergen shipped approximately 119 million. Defendant McKesson shipped more than 150 million.[12]

---

[11] *Combatting the opioid epidemic, supra, available at* https://www.congress.gov/115/meeting/house/108260/documents/HHRG-115-IF02-Transcript-20180508.pdf.

[12] *Id.*

17.     From 2009 to 2011, Cardinal Health shipped an average of about 4,000 pills per day to a single pharmacy in West Virginia.[13] During a two-year period, McKesson supplied the Sav-Rite in Kermit, West Virginia, with a population of 400 at the time, with almost 5 million opioid doses.[14] The magnitude, concentration, and persistence of these shipments were unmistakable red flags. These quantities were so obviously aberrant that Defendants knew, or deliberately avoided knowing, that the opioids they were shipping were being diverted for non-medical use. The nuisance a negligence alleged here arise from Defendants' massively excessive distributions and their failures to maintain effective controls against diversion and abuse.

***The industry's duties were well known and repeatedly reinforced.***

18.     Opioids are addictive and deadly. Because of their well-known risks, entities in the opioid supply chain—including distributors like Defendants AmerisourceBergen, Cardinal Health, and McKesson—are required by law to design and operate robust systems to track and evaluate risks. Defendants owed, and breached, legal duties that included, at a minimum:

   a.     Identifying suspicious orders, including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

   b.     Reporting suspicious orders to the U.S. Drug Enforcement Administration; and

   c.     Conducting thorough independent analyses of suspicious orders, including requesting additional information from the pharmacy that placed the order;

   •   documenting the pharmacy's explanation;

   •   following up to determine the legitimacy of the order; and

   •   blocking the order pending the completion of these steps.[15]

---

[13] *Id.*
[14] *Id.*
[15] The distributors' legal obligations are imposed by the federal Controlled Substances Act and its implementing regulations and by West Virginia's Controlled Substances Act and its

*The DEA repeatedly raised the alarm about opioid oversupply.*

19.     The DEA has long emphasized that distributors of controlled substances bear primary responsibility for maintaining effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system created by the Controlled Substances Act collapses.[16]

20.     The DEA has repeatedly reminded distributors of their suspicious order related obligations.

21.     In September 2006, in response to what it described as a "serious and growing health problem in this country," the DEA sent a letter to distributors (the 2006 Letter) reiterating their responsibilities "in view of the prescription drug abuse problem our nation currently faces."[17] This 2006 Letter emphasized distributors' duties to identify suspicious orders, to inform the DEA "of suspicious orders when discovered," and to "avoid filling suspicious orders that might be diverted[.]"[18]

22.     In December 2007, the DEA sent a second letter (2007 Letter), again reminding distributors of their obligation to "inform the local DEA Division Office of suspicious orders when discovered by the registrant." This letter also explained that:

> Filing a monthly report of completed transactions (*e.g.*, "excessive purchase report" or "high unit purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing

---

implementing regulations. *See* W. Va. Code R. 15-2-5; 21 C.F.R. § 1301.74(b); *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017); *Southwood Pharms., Inc.*, 72 Fed. Reg. 36487-01, 36498, 2007 WL 1886484 (DEA July 3, 2007).

[16] Decl. of Joseph Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, ¶ 10, *available at* https://www.industrydocuments.ucsf.edu/docs/smff0232/.

[17] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), *available at* https://www.industrydocuments.ucsf.edu/docs/qjbf0232.

[18] *Id.*

of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.[19]

23.    In 2007 and 2008, each Defendant entered into settlement agreements with the DEA to resolve allegations that they had failed to block and report suspicious controlled substances orders.[20] These settlements placed Defendants on heightened notice that their existing controls were inadequate and that continued failures would constitute intentional and knowing violations of the law.

***Defendants consciously disregarded red flags and took affirmatively evasive actions to avoid notice.***

24.    Despite strict duties, repeated warnings, and knowledge, Defendants continued to flood West Virginia with opioids, selling ever-increasing quantities. They did so knowingly, willfully, and in conscious disregard of obvious diversion, prioritizing sales volume and revenue over compliance. Defendants egregiously violated their duties to monitor, detect, and prevent suspicious sales, and, indeed, deliberately designed and operated their controlled substance

---

[19] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *available at* https://www.industrydocuments.ucsf.edu/docs/sgmx0287/.

[20] *See* Press Release, Drug Enforcement Administration, *DEA Suspends Orlando Branch of Drug Company from Distributing Controlled Substances* (Apr. 24, 2007), *available at* https://www.dea.gov/sites/default/files/divisions/mia/2007/mia042407p.html; *AmerisourceBergen Signs Agreement With DEA* (June 22, 2007), *available at* https://www.sec.gov/Archives/edgar/data/1140859/000119312507141013/dex991.htm; Settlement & Release Agreement & Administrative Memorandum of Agreement (May 2, 2008) *available at* https://www.dea.gov/sites/default/files/2018-06/Pharmaceutical%20Agreements%20-%20McKesson%20-%202008_0.pdf; Press Release, U.S. Attorney's Office, Colorado, *Cardinal Health Inc. Agrees To Pay $34 Million to Settle Claims That it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances* (Oct. 2, 2008), *available at* https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

monitoring programs (CSMPs) to ensure that opioid (and other controlled substance) orders would *not* be identified as suspicious or blocked. Defendants rigged their CSMPs to allow continued shipping of ever-increasing and excessive quantities of opioids into West Virginia, knowing or willfully ignoring that their shipments were being diverted.

25.    Defendants' CSMPs shared systemic flaws that were the predictable result of conscious design choices. First, all Defendants purported to limit the number of units that their pharmacy customers could buy by establishing monthly "thresholds," typically measured by pill counts. But these threshold caps were fundamentally defective in both design and implementation. Defendants CSMPs treated low-dose and high-dose pills equivalently, counting both 5-milligram and 80-milligram tablets as one unit. even though an 80-milligram tablet contains 16 times the opioid. Defendants also systematically set thresholds at levels that were grossly excessive—often basing them on a pharmacy's historical monthly orders. As a result, pharmacies with demonstrably excessive prior orders were permitted—and encouraged—to continue ordering at those excessive levels, perpetuating rather than correcting the problem. For example, Cardinal, *tripled* monthly averages to create threshold amounts. Defendants further undermined their "thresholds" by exempting their chain pharmacy customers or subjecting them to looser standards; enforcing thresholds inconsistently for other customers; increasing or manipulating thresholds at a customer's request to reduce scrutiny and protect revenue; and even coaching pharmacies about how to avoid triggering review altogether. These acts and omissions were not inadvertent. They were deliberate artifices that allowed Defendants to continue shipping opioids while avoiding formal determinations of diversion and abuse.

26.    Second, Defendants failed to collect, review, or act on critical customer data that would have revealed diversion and abuse. They generally failed, for example, to require

customers to disclose past discipline for controlled substance diversion; failed to assess the prevalence of customers' remote or out-of-state orders; failed to evaluate whether customers were dispensing orders to suspicious prescribers, including doctors' offices operating as "pill mills"; and failed to assess whether customers were simultaneously receiving opioids from other distributors.

27.     Third, all Defendants systematically under-staffed and under-resourced their CSMP functions, assigning too few employees to compliance roles and giving them inadequate training and supervision. Rather than protecting the public from dangerous pharmacies, Defendants conspired with those pharmacies to keep flooding West Virginia with opioids.

28.     By failing to design and operate effective CSMPs, Defendants distributed wildly excessive quantities of dangerous and addictive opioids into West Virginia, fueling an epidemic of opioid abuse, misuse, diversion, and death. That epidemic has foreseeably and, in fact, inevitably imposed enormous costs on public institutions, including public schools.

29.     Taken together, the extraordinary volume and concentration of opioids Defendants shipped into West Virginia; the prolonged operation of extreme outlier pharmacies; the numerous, objective red flags identified in DEA guidance; Defendants' receipt of repeated warnings from regulators and others; and Defendants' prior settlements with the DEA establish that Defendants knew, or at a minimum recklessly disregarded, that a substantial portion of the opioids they distributed into West Virginia were being diverted for non-medical use.

30.     Defendants nonetheless continued these distribution practices without implementing monitoring systems reasonably calibrated to detect and stop diversion, allowing excessive shipments to continue for years after they were clearly on notice of the risks.

31.     The injuries alleged here were not the result of isolated misconduct by third parties. They were the foreseeable consequence of Defendants' sustained oversupply of opioids and their failure to implement and enforce effective controls against diversion—conduct that predictably increased opioid availability, addiction, and prenatal opioid exposure in West Virginia. The resulting educational impacts and mandated special-education expenditures are the kind of community-wide institutional harms that Defendants were repeatedly warned would follow from uncontrolled diversion and oversupply.

***The government's investigations obtained admissions from Defendants.***

32.     An August 2015 external review of AmerisourceBergen's CSMP measures concluded that compliance staff received little formal training, were "overwhelmed by the volume of activities they are required to perform," and suffered from a pervasive "lack of direction" from management. Some compliance staff stated they were "constantly putting out fires," and the review found that AmerisourceBergen's compliance division lacked access to timely and comprehensive information necessary to perform its duties.[21]

33.     In 2017, McKesson paid a record-setting $150 million fine after a federal investigation that concluded McKesson had failed to properly monitor its sales of controlled substances and report suspicious orders to DEA, in violation of both its 2008 settlement agreement and the Controlled Substances Act, 21 C.F.R. § 130l.74(b). The investigation further found that McKesson failed to conduct adequate due diligence about its customers, failed to keep complete and accurate records, and bypassed its own suspicious-order reporting procedures.[22]

---

[21] *See* Deposition of David May, *In Re: Nat'l Prescription Opiate Litig.*, at 141-42, *available at* https://www.industrydocuments.ucsf.edu/docs/qswf0232/.

[22] *See* Press Release, U.S. Dep't of Justice, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs* (Jan. 17, 2017), *available at* https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

34.     In 2016, Cardinal paid $44 million to resolve a federal investigation that concluded that, despite its 2007 settlement with the DEA, the company continued to violate the federal Controlled Substances Act. Cardinal admitted that, from 2009 to 2012, it failed to report suspicious orders as required by law.[23]

35.     In May 2018, Defendants' chief executive officers testified before Congress. Cardinal Health's Chairman, George Barrett, admitted that "we had a system that allowed for too much subjectivity about the legitimacy of a pharmacy."[24] McKesson's chairman, John Hammergren, acknowledged that the company failed to move quickly enough to terminate West Virginia pharmacies that were "bad actors," admitting that McKesson "did not properly manage" those relationships and "certainly didn't do it soon enough" and "We learned important lessons."[25]

***Impacts on public school boards in West Virginia.***

36.     Because of Defendants' misconduct, thousands of students enrolled in public schools in West Virginia were born with NAS and, because of that condition, require special education services and support. The costs of providing these legally mandated services and support are borne by the Class Member school districts in this case.

37.     On average, Class Members' expenditures to provide special education services and additional supports to these students are currently approximately $10,000 per pupil per year. These costs recur each year until each student graduates from high school: a student entering

---

[23] *See* Press Release, U.S. Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act* (Dec. 23, 2016) *available at* https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.

[24] *Combatting the opioid epidemic, supra, available at* https://www.congress.gov/115/meeting/house/108260/documents/HHRG-115-IF02-Transcript-20180508.pdf.

[25] *Id.*

kindergarten this year will not finish high school until approximately 2037. These costs will continue to grow both with inflation and, while the opioid crisis continues, as additional students born with NAS but not yet of school age enter the public school system.

### Class Allegations

37.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all independent public school boards in the state of West Virginia.

38.     Plaintiffs are members of the Class they seek to represent.

39.     Plaintiffs may move to amend the class definition, divide the class into subclasses, or limit class certification to particular issues as facts develop or circumstances require or suggest desirable or necessary refinements.

40.     <u>Numerosity</u>. The members of the Class are sufficiently numerous that joinder of all members is impracticable. There are 55 county public school boards in West Virginia.

41.     <u>Commonality and Predominance</u>. There are questions of fact and law common to all members of the Class. These questions are capable of resolution through common evidence, well-suited to class-wide adjudication, and predominate over any questions affecting only individual West Virginia school boards. Common questions include but are not limited to:

- Whether Defendants distributed opioids into West Virginia in quantities that far exceeded legitimate medical need.

- Whether Defendants knew or should have known that substantial quantities of the opioids they were shipping into West Virginia were being diverted for non-medical use.

- Whether by flooding West Virginia with opioids in quantities far outpacing any medical need for them, Defendants contributed to a public nuisance under West Virginia law.

- Whether Defendants breached duties of reasonable care owed to the public, including public schools, by failing to prevent the diversion of opioids.

- Whether Defendants' conduct contributed to an increase in the number of

children exposed to opioids in utero.

- Whether exposure to opioids in utero disproportionately causes children to exhibit higher rates of behavioral and emotional disorders and cognitive disabilities.

- Whether impairments caused by exposure to opioids in utero necessitate special education services and other supports in public schools.

- Whether the costs incurred and to be incurred by West Virginia public schools to provide special education services and supports to students exposed to opioids in utero were a foreseeable and proximate result of Defendants' conduct.

- Whether Defendants are liable to the Class for resulting damages under applicable law.

42.     Typicality. Plaintiffs' claims are typical of the claims of other Class members because they are all bringing the same claims, arising from the same conduct by Defendants, and they are seeking the same forms of relief.

43.     Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and they have retained experienced and accomplished counsel who are able and prepared to expend the resources necessary to litigate this case and who are experienced in litigating class actions.

44.     Superiority. A class action is superior to other methods for fairly and efficiently adjudicating this controversy, as joinder of all Class members is impracticable. Class litigation will also avoid the possibility of inconsistent and conflicting adjudication of the claims asserted herein. Alternatively, class-wide liability under the theories advanced in this complaint could properly be certified under Rule 23(c)(4).

**Statute of Limitations**

45.     All possibly relevant statutes of limitations and time-barring defenses potentially applicable to any claim in this complaint were tolled, on November 20, 2019, by the filing of a

class action complaint on behalf of all independent public school districts nationwide, including West Virginia school districts. *See In re Nat'l Prescription Opiate Litig.*, No. 1:19-op-46042-DAP (N.D. Ohio), Class Action Compl., Dkt. No. 1 (pleading class-wide claims for, among others, public nuisance, negligence, and violation of statutory duties against McKesson, Cardinal Health, and AmerisourceBergen). *See also In re W. Virginia Rezulin Litig.*, 214 W. Va. 52, 66 n.10 (2003) (discussing *American Pipe* tolling); *Glover v. EQT Corp.,* No. 5:19-cv-223, 2020 WL 13094071, at *5 (N.D. W. Va. June 1, 2020) (same).

46.    Separately, this action is also timely because the public nuisance that is the result of the opioid crisis continues to manifest in West Virginia public schools through ongoing, legally mandated education expenditures and services for children affected by prenatal opioid exposure.

### Causes of Action

### Count I:
### Common Law Public Nuisance

47.    Plaintiffs repeat paragraphs 1-46.

48.     Under West Virginia law, a public nuisance is an act or condition that unlawfully interferes with a right common to the general public. *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 921 (W. Va. 1997); *Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992). An unreasonable interference with public rights may constitute a nuisance where a defendant creates, contributes to, or maintains a hazardous condition affecting the public at large. Restatement (Second) of Torts § 821B (1979).

49.    This action does not challenge the lawful manufacture or mere existence of prescription opioids. The nuisance alleged here arises from Defendants' creation and maintenance of a dangerous condition in West Virginia through their distribution practices—

specifically, the sustained oversupply of opioids in volumes far exceeding legitimate medical need, combined with Defendants' failure to maintain effective controls against diversion despite repeated warnings and objective indicators of abuse.

50.     By flooding West Virginia with excessive quantities of opioids and continuing to do so after the risks of diversion, misuse, and community harm were well known, Defendants created and perpetuated a condition of abnormal and dangerous opioid availability throughout the State. That condition foreseeably interfered with public health, safety, and welfare and with the functioning of essential public institutions, including public school systems.

51.     Defendants exercised control over the distribution practices that created and maintained this hazardous condition. Defendants had the ability and legal obligation to monitor, limit, investigate, and block suspicious orders, and to calibrate distribution volumes to legitimate medical needs, but consciously failed to do so.

52.     Defendants' conduct was unreasonable. After receiving repeated warnings from regulators, law enforcement, and internal compliance personnel—and after entering into settlements addressing similar misconduct—Defendants continued distribution practices that sustained the dangerous condition and allowed it to worsen.

53.     As a direct and proximate result of this condition, Plaintiffs and Class Members suffered special and distinct injuries different in kind from those suffered by the public. The condition Defendants created foreseeably increased prenatal opioid exposure, resulting in a population of children with developmental, cognitive, and behavioral impairments requiring legally mandated special education services and related supports.

54.     Plaintiffs and Class Members, as public school boards, are legally obligated to identify, evaluate, and provide those services and to fund them from finite public school budgets.

These compulsory institutional expenditures and operational burdens constitute special injuries sufficient to confer standing to seek abatement of a public nuisance.

55.    The dangerous conditions Defendants created and maintained continue to cause ongoing harm. Absent abatement, it will continue to interfere with Plaintiffs' and Class Members' ability to fulfill their statutory educational obligations and will continue to impose substantial and foreseeable public costs on West Virginia's public school systems.

56.    Plaintiffs and Class Members seek equitable relief to abate this nuisance, including remedial measures reasonably necessary to eliminate or mitigate the dangerous condition and its ongoing effects on public schools. The relief requested here is forward-looking and directed at remedying the condition itself and not at compensating individual personal injuries. *See City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 574-75 (4th Cir. 2025).

**Count II:**
**Common Law Negligence**

57.    Plaintiffs repeat paragraphs 1-46.

58.    Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in the distribution of controlled substances into West Virginia. That duty included taking reasonable measures to prevent the foreseeable diversion, misuse, and oversupply of opioids in quantities far exceeding legitimate medical need, where such conduct posed unreasonable risks of widespread harm to public health and to public institutions, including public schools. This duty arises from Defendants' role as controlled substance distributors, exists independent of any contractual relationship, and prevents public health and safety harms that foreseeably impose consequences and costs on public institutions like school districts.

59.    Defendants breached their duty of reasonable care by, among other things,

17

distributing massive quantities of opioids into West Virginia far outpacing medical need; failing to design, implement, and enforce effective systems to detect, investigate, report, and block suspicious orders; and continuing those practices despite clear knowledge of and warning signs of diversion, misuse, and escalating harm.

60.     The harms caused by Defendants' conduct were foreseeable. It was reasonably foreseeable that flooding communities with excessive quantities of opioids would contribute to addiction, prenatal opioid exposure, and long-term developmental harm, and would impose substantial costs on public institutions responsible for educating and supporting affected children.

61.     As a direct and proximate result of Defendants' negligence, Plaintiffs' and Class members' ability to educate West Virginia children as mandated by law has been threatened and compromised, and Plaintiffs and Class Members have suffered damages, including but not limited to: (a) expenditures to provide special education services and supports to students suffering from learning, behavioral, and cognitive impairments associated with prenatal opioid exposure; and (b) direct costs incurred to provide health care, disability benefits, and workers' compensation to employees affected by the opioid epidemic.

### Count III:
### Negligent Violation of Statutory Duties

62.     Plaintiffs repeat paragraphs 1-46.

63.     Under the federal Controlled Substances Act and corresponding West Virginia law, Defendants' duties of reasonable care included compliance with statutory and regulatory requirements governing controlled substance distributors, including the duty to design and operate effective systems to prevent diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b). These

statutory and regulatory duties protect public health and safety, including the welfare of communities and public institutions foreseeably harmed by diversion and oversupply.

64.    Defendants' violations of these statutory duties—by flooding West Virginia with quantities of opioids that far outpaced any medical need for them and failing to detect, report, and block suspicious orders of opioids—constitute evidence of negligence, at a minimum, under West Virginia law.

65.    As a direct and proximate result of Defendants' negligent violation of statutory duties, Plaintiffs' and Class Members' ability to educate West Virginia children as mandated by law has been threatened and compromised, and Plaintiffs and Class Members have suffered damages, including but not limited to: (a) expenditures to provide special education services and supports to students suffering learning, behavioral, and cognitive impairments associated with in utero opioid exposure; and (b) direct costs to provide health care, disability benefits, and workers' compensation to their employees.

## Jury Demand

Plaintiffs request a jury for all claims that may be tried to a jury.

## Prayer for Relief

**WHEREFORE**, Plaintiffs ask the Court to:

a.    Certify the class, appoint Plaintiffs as the representatives of the Class, and appoint their counsel as Class Counsel;

b.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law, including restitution and disgorgement;

c.    Award all available equitable relief, including injunctive and abatement relief requiring Defendants to fund reasonable programs and services to remediate and

mitigate the opioid epidemic, which they ignited and fueled, and its effects on

West Virginia public schools.

d.      Award costs and reasonable litigation expenses and attorneys' fees;

e.      Award pre- and post-judgment interest to the extent allowable;

f.      Provide all such other and further relief as the Court deems reasonable and just.


Dated: February 3, 2026                    Respectfully submitted,

                                           */s/ Benajmin L. Bailey*
                                           Benjamin L. Bailey
                                           John W. Barrett
                                           BAILEY & GLASSER, LLP
                                           209 Capitol Street
                                           Charleston, WV 25301
                                           T: 304.345.6555
                                           bbailey@baileyglasser.com
                                           jbarrett@baileyglasser.com

Neil Henrichsen                            Michael Murphy
HENRICHSEN LAW GROUP, PLLC                 BAILEY & GLASSER, LLP
655 15th Street, N.W., Suite 800           1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20005                       Washington, DC 20007
T: 202.423.3649                            T: 202.463.2101
nhenrichsen@hslawyers.com                  mmurphy@baileyglasser.com

Wayne Hogan                                Cyrus Mehri
TERREL HOGAN YEGELWEL, P.A.                Joshua Karsh
233 East Bay Street, 8th Floor             MEHRI & SKALET, PLLC
Jacksonville, FL 32202                     2000 K Street, N.W., Suite 325
T: 904.722.2228                            Washington, DC 20006
hogan@terrellhogan.com                     T: 202.822.5100
                                           cmehri@findjustice.com
                                           jkarsh@findjustice.com